# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CUMMINGS INCORPORATED, THE** | ) | |
| **INTERNATIONAL SIGN SERVICE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:06-0890** |
| | ) | **Judge Trauger** |
| **BP PRODUCTS NORTH AMERICA, INC.,** | ) | |
| **BLAIR SIGN COMPANY and DONALD** | ) | |
| **DEVORRIS,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

_____

***CONSOLIDATED WITH:***

| | | |
|---|---|---|
| **DONALD DEVORRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:07-0834** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **CUMMINGS INCORPORATED, THE** | ) | |
| **INTERNATIONAL SIGN SERVICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is a Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial or, in the Alternative, Motion to Alter or Amend the Judgment filed by Blair Sign Company ("Blair Sign") and Donald Devorris (Docket No. 211) and Cummings Incorporated, the International Sign Service's ("Cummings's") Motion to Strike

1

the Affidavit of Philip Devorris (Docket No. 226).  For the reasons discussed herein, Cummings's motion will be denied, and the motion for post-trial relief filed by Blair Sign and Devorris will be granted to the extent that the court will enter an order reducing the punitive damage award; otherwise, the motion for post-trial relief will be denied.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A broad and thorough overview of the facts of this case was provided in the court's lengthy Memorandum that ruled on the summary judgment motions in this case.  (See Docket No. 154.)  Therefore, a brief overview of the largely undisputed facts is provided, and more specific analysis is provided in regard to the specific arguments made by the parties in conjunction with their motions for post-trial relief.

Cummings is a sign manufacturing company based in Nashville, Tennessee.[1]  Blair Sign is a sign manufacturing company based in Altoona, Pennsylvania.  Defendant Donald Devorris is the founder and chairman of The Blair Companies, which is a collection of businesses, the largest of which is Blair Sign.  As of 1996, Donald Devorris's son, Philip Devorris, has been the Chief Executive Officer and the President of Blair Sign.

The central dispute between these two sign manufacturing companies arose in the late Spring and early Summer of 2006.  In May 2006, Cummings learned that its friendly rival in the sign manufacturing business, Blair Sign, had obtained an agreement with BP Products North America ("BP") to exclusively supply the "bull nose" signs that BP needed for its gas stations.

_____

[1] The facts, as discussed herein, are largely drawn from the court's memory and notes of the trial, which are confirmed by the facts as discussed in the parties' post-trial briefing.

2

Heretofore, this "bull nose" work had been exclusively performed by Cummings.  One consequence of this sudden loss of "bull nose" business was that Cummings had a substantial inventory of BP-specific "bull nose" signs and raw materials that it could not use.

As mentioned, Blair Sign and Cummings were, at least at one time, friendly rivals.  The parties had an oft-amended consulting agreement that, under the version relevant in this case, obligated Cummings to pay Donald Devorris $8,333 per month ($100,000 per year) in exchange for up to three hours per week of Devorris's business consulting.  On June 5, 2006, after Cummings learned that it had lost the BP "bull nose" business, Cummings CFO Tony Schofield sent a "consulting request" to Donald Devorris, seeking Devorris's insight on twelve topics related to inventory control.  At trial, Schofield stated that, while he felt that issues of "inventory control" were within Devorris's expertise and Cummings needed help with this issue, he also testified that he hoped opening a dialogue about Cummings's inventory issues might result in Blair Sign's buying up some of that BP-specific inventory.

As discussed in the summary judgment Memorandum, over the next six weeks: (1) both sides exchanged correspondence about whether or not Schofield's request was reasonable; (2) Cummings withheld its July 2006 consulting agreement payment; (3) Devorris enlisted others at Blair Sign in an arguably half-hearted effort to respond to some of the issues raised in the request;  and, (4) when, as of July 21, 2006, Devorris had not received his consulting agreement payment for July 2006, he sued Cummings.  Devorris never provided a deliverable to Cummings in response to Cummings's June 5 request, and Cummings never paid Devorris's consulting agreement fee for July 2006 or for any month thereafter.

In response to Devorris's lawsuit, Cummings filed a lawsuit of its own, claiming that Blair Sign, Devorris, and BP had committed a variety of violations of law. The two lawsuits were eventually consolidated before this court, and BP settled with Cummings. Following the court's summary judgment ruling, three claims proceeded to trial: (1) Cummings's claim that Blair Sign "intentionally interfered" with Cummings's "business relationship" with BP (the "IIBR" claim); (2) Cummings's claim that Blair Sign breached the non-competition provision (Section 6) of the parties' Consulting Agreement by impermissibly contacting BP in 2003 and 2004; and (3) Devorris's claim that Cummings breached the Consulting Agreement by not paying him his July 2006 consulting fee and subsequent consulting fees as they came due. (Docket No. 203.)

The trial of this matter lasted slightly more than one week. At the end of the trial, on June 3, 2009, the jury returned a verdict in favor of Cummings. (*Id.*) That is, the jury awarded Cummings $370,750 on the breach of contract claim, and $535,486 on the IIBR claim and further found that Cummings had not breached the Consulting Agreement by not paying Devorris his consulting agreement fee after June 2006. Having found Blair Sign liable on the IIBR claim, the jury heard brief argument and testimony on Cummings's punitive damages claim. After brief deliberations, the jury awarded Cummings $2,620,000 in punitive damages. (Docket No. 205.)

## ANALYSIS

Following an adverse verdict in the jury trial in this case, Blair Sign and Donald Devorris have filed their motion for post-trial relief. Specifically, Blair Sign seeks a judgment as a matter

of law, under Federal Rule of Civil Procedure 50(b), in its favor on Cummings's IIBR and breach of consulting agreement claims. In the alternative, Blair Sign seeks, under Federal Rule of Civil Procedure 59(a), a new trial on those claims. Also, Devorris seeks a new trial on his breach of consulting agreement claim. All of these motions challenge the sufficiency of the evidence supporting the jury's verdict. Blair Sign also moves, under Federal Rule of Civil Procedure 59(e), for the court to "alter or amend," (that is, reduce) the punitive damage award.[2] Finally, Cummings has filed a motion to strike Philip Devorris's affidavit, which was filed in support of the Rule 59(e) motion.

## I. Standards of Review (Post Trial Motions)

### A. Rule 50(b)

In diversity actions such as this one, a Rule 50(b) motion that is premised on a challenge to the sufficiency of the evidence is reviewed under the standard applied by the courts of the state whose substantive law controls the action – here, Tennessee. *See Pendleton v. Over the Top, LLC*, 261 Fed. Appx. 869, 871 (6th Cir. 2008). Under this substantive law, a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) **may only be granted where, taking the strongest legitimate view of the evidence in favor of the non-moving party, construing all evidence and inferences in that party's favor and disregarding all countervailing evidence, all reasonable minds would necessarily find in favor of the moving party.** *Id; Johnson v. Tenn. Farmers Mut Ins. Co.*, 205 S.W.3d 365, 370 (Tenn.

---

[2] Technically, Blair Sign cites Rule 59(a), but a Motion to Alter or Amend, which is the motion Blair Sign is explicitly making here, is a motion under Fed R Civ. P. 59(e).

5

2006).

**B.    Rule 59(a)**

While a new trial can be ordered for a wide variety of reasons, generally, a court may grant a new trial under Fed. R. Civ. P. 59(a) "if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000). The burden of demonstrating the necessity of a new trial is on the moving party, and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court. *Clarksville-Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991). Here, based on Blair Sign's and Devorris's briefing, the only relevant consideration is whether the verdict was against the weight of the evidence.

In a diversity case, in deciding a motion for a new trial based on the proposition that the verdict is against the weight of the evidence, the court applies federal law. *Conte*, 215 F.3d at 637. That is, the trial court may compare and weigh the opposing evidence. *Id.* It may not, however, set aside a jury's verdict simply because the court might have reached a different conclusion or might have drawn different inferences; the jury's verdict should be accepted if it "could reasonably have been reached." *Id.*

**C.    Rule 59(e)**

A court should grant a motion under Rule 59(e) to "alter or amend" a judgment when there has been a clear error of law, newly discovered evidence, an intervening change

6

in controlling law, or to prevent manifest injustice. *GenCorp. v. Am. Intern. Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999). Here, Blair Sign argues that the punitive damage award should be eliminated or reduced because it is "grossly excessive" under the guideposts elucidated in the Supreme Court's *BMW v. Gore*, 517 U.S. 559 (1996) decision, and, therefore, the award violates Blair Sign's due process rights.

## II.     Application

It is clear from the facts and the legal standards discussed above that, if the court finds that the evidence presented at trial reasonably supported the jury's verdict, then Blair Sign's and Devorris's motions, except as to the punitive damages award, should be denied. Therefore, the court will consider the arguments about the evidence presented at trial, before considering the punitive damages issue.

### A.     IIBR Claim

As the jury instructions properly advised the jury, in this case, Cummings had to show five elements to prevail on a claim for intentional interference with business relationships: (1) an existing business relationship with BP; (2) Blair Sign's knowledge of that relationship; (3) Blair Sign's intent to cause the breach or the termination of that relationship; (4) Blair Sign's improper motive or improper means; and (5) damages caused by the tortious interference. (Docket No. 201 at 23; *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W. 3d 691, 701 (Tenn. 2002)). Here, Blair Sign does not challenge the first two elements. However, Blair Sign argues that the evidence supporting (1) its use of improper means, (2) its intent to breach or terminate the BP/Cummings relationship, and

7

**(3) Cummings's damages was all insufficient to support the jury's verdict on the IIBR claim.**

        1.        **"Improper Means"**

As discussed in the summary judgment Memorandum and in the jury instructions, a precise definition of improper means is not possible. (Docket No. 201 at 24; Docket No.154 at 22.) Rather, whether the means used to breach or terminate an existing business relationship were "improper" depends on the facts and the circumstances of each case. *Trau-Med*, 71 S.W. 3d at 701. In *Trau-Med*, the Court indicated that certain third-party activity that ruptures a business relationship, such as activity that is "illegal or independently tortious," may very well constitute "improper means," but, on the other hand, not every act of arguably "unfair competition" is an example of the use of "improper means." *Id.* That said, "improper means" can, under appropriate circumstances, simply be conduct that is "deceit[ful]," or conduct that involves "sharp dealing" or "overreaching." *Id.* In examining whether "improper means" were used, the court should also examine whether the means used were "unethical" and/or were "methods that violate an established standard of a trade or profession." *Id.*

Here, Cummings contends that the means Blair Sign allegedly used to break up the BP/Cummings "bull nose" relationship were improper. In its response to Blair Sign's post-trial motion, Cummings does an effective job of marshaling the evidence that it presented at trial of "fraud and deceit," "unfair competition," "unethical conduct," "misuse of inside or confidential information" and "sharp dealing and overreaching" all of which, it claims,

8

demonstrates that Blair Sign used "improper means." (Docket No. 225 at 9-13.)

Among other things, the evidence is that, as of September 2004, Philip Devorris was, via e-mail, soliciting individuals at BP for an additional share of BP's MID sign work but also for a share of any "additional products or services" that "you feel appropriate," which would, obviously, include the bull nose sign business. (Docket No. 225 at 9.) In April 2005, BP conducted a site visit to Cummings's plant to view Cummings's bull nose manufacturing machine, and multiple individuals who attended the site visit testified that photos of the bull nose manufacturing machine were taken. (*Id.* at 11.) While BP representative Eric Ulmer, who attended the site visit and who was intimately involved in the BP/Blair Sign negotiations, testified that the purpose of the visit (and the photos) was to resolve a dispute with Cummings as to who owned the bull nose manufacturing equipment, Ulmer could not effectively explain how taking pictures of the equipment would help the ownership argument, nor could he explain what happened to the pictures. (*Id.* at 11-12.)

The evidence also showed that, by Summer 2005, BP and Blair Sign were ramping up their secret efforts to transfer the bull nose work from Cummings to Blair Sign. For instance, in an August 4, 2005 e-mail, Philip Devorris wrote Ulmer to propose "that Blair take the [bull nose] business" from Cummings as a trade off for a long-existing debt that Devorris believed Cummings owed Blair Sign. (*Id.* at 9.) During this same time period, e-mails were exchanged between Blair Sign and BP representatives that discussed, among other things, that BP had sent "all" of its "technical information" about the bull nose equipment to Blair Sign and that Blair Sign had found the information to be "very

9

helpful." (*Id.* at 10-11.) Additionally, on August 23, 2005, in preparation for an "internal meeting," Philip Devorris explicitly asked Kent Stoneburner of BP for "your photos of the [Cummings'] machine." (*Id.*)

The e-mails and testimony at trial also demonstrated that Blair Sign worked on developing the bull nose technology through Spring 2006, all while BP continued to order bull nose products from Cummings – Cummings apparently oblivious to the fact that it was about to lose the bull nose business. By Spring 2006, Blair Sign was able to provide for BP's bull nose needs. Therefore, at this time, BP terminated its relationship with Cummings, and left Cummings with about $250,000 in bull nose raw material and finished goods. (*Id.* at 12.) In sum, through a collection of e-mails and trial testimony, Cummings attempted to show that, over a course of years, Blair Sign plotted to take this business from Cummings and did so secretly and with the use of underhanded tactics.

Blair Sign argues that its secret solicitation of BP was nothing more than "legitimate competition with its competitor," and the fact that BP embraced Blair Sign was reflective of the fact that, as several BP employees testified, BP and Cummings did not have a particularly warm business relationship and the fact that BP wanted a new exclusive provider of bull nose signs. (Docket No. 212 at 7-10.) Moreover, as to the allegations of more duplicitous conduct, such as using the photographs of the Cummings machine, Blair Sign contends that Cummings never established that Blair Sign ever acquired or used Cummings's technical information or photographs. (*Id*. at 7.) Philip Devorris and Ulmer also testified, as was borne out by photos introduced into evidence, that the Blair Sign bull

nose machine ended up being "completely different" from the Cummings machine. (*See* Docket No. 212 at 8.) In sum, Blair Sign argues that the court should not permit legitimate, albeit tough, competition to become an intentional tort under Tennessee law. (*Id.* at 10.)

The jury's implicit verdict that Blair Sign used "improper means" could "reasonably have been reached." While Cummings and Blair Sign were competitors, as noted above, their relationship had been established as one of friendly competition, in which, among other things, Cummings paid Donald Devorris, the Chairman of the Blair Companies, $100,000 per year for his availability to offer limited consulting services to Cummings. As Cummings Executive Vice-President Jim Murray testified, he was "shocked" when he learned of the BP/Blair Sign bull nose negotiations, because a relationship of trust had developed between these two sign makers.

Despite this relationship of trust, it is undisputed that, over the course of months, if not years, Blair Sign and BP engaged in secret negotiations to transfer the bullnose business to Blair Sign – a business that all of the principals knew had been heretofore exclusively provided by Cummings. A clear consequence of the confluence of the secret negotiations and the exclusive arrangement was that Cummings was going to purchase bull nose raw material and produce bull nose signs, all of which it would have no use for once BP and Blair Sign finalized their new, exclusive arrangement. Therefore, on these facts, a reasonable juror could conclude that Blair Sign abused this relationship of trust and behaved unethically.

If more was needed to push this "unfair" and "unethical" conduct into the realm of

11

"improper means," the attempts to obtain images of and technical information about the Cummings machine provide that extra push. It was not necessary for Cummings to prove, without a doubt, that Blair Sign obtained surreptitiously taken pictures of the Cummings machine and/or technical information about the Cummings machine. When it comes to finding improper means here, the discussion of this information, discussed above, speaks volumes. For instance, Devorris's request for pictures of the Cummings machine permits the reasonable inferences (1) that BP and Blair Sign had discussed, among other things, that pictures of the Cummings machine existed and (2) that Blair Sign and BP had discussions of how those pictures could be helpful to Blair Sign in designing its own bull nose machine. Also, the statement that BP had provided Blair Sign with "all" of its bull nose "technical information" permits the reasonable inference that BP had gathered bull nose information from Cummings, BP's exclusive provider of bull nose signs, and had relayed that information to Blair Sign. A reasonable fact finder could, therefore, conclude that, not only was Blair Sign secretly negotiating with BP, but that it was improperly using Cummings's "intelligence" to aid its negotiations. This is undoubtedly the type of "overreaching" and "unethical" conduct captured in the phrase "improper means."

In short, it is not necessary to discuss every e-mail and shred of evidence that Cummings contends shows that Blair Sign used improper means here. Given the facts and circumstances of this case, including the relationship of trust between Blair Sign and Cummings, there is sufficient evidence of, among other things, "unethical" conduct, "sharp dealing," "deceit" and "overreaching," for the jury to have reasonably concluded that

12

Blair Sign used improper means.

        2.        Intent

Blair Sign argues that "Cummings failed to provide a sufficient factual basis from which the jury could reasonably find that Blair Sign intended to cause the breach or termination of Cummings' business relationship with BP."  (Docket No. 212 at 10.)  Blair Sign contends that it merely sought to grow its own business, not necessarily to destroy Cummings's relationship with BP.  (*Id.*)  Blair Sign also points out that, as of June 2005, there was no Global Purchase Agreement in place between Cummings and BP, and, therefore, it argues, no relationship for it to breach or terminate.  (*Id.* at 11.)

The evidence showed that BP did not renew its Global Purchase Agreement with Cummings in June 2005.  But, the evidence also clearly showed that a business relationship between Cummings and BP persisted, that is, Cummings continued to exclusively provide BP with bull nose signs until Blair Sign took the business in Spring 2006.  (Docket No. 225 at 26.)  Philip Devorris's August 4, 2005 "take the business" e-mail discussed above strongly indicates that Blair Sign was well aware, even after Cummings no longer had a Global Purchase Agreement with BP, that Cummings was still producing bull nose signs for BP, and a reasonable inference from the tenor of the entire "batch" of e-mails introduced into evidence is that Blair Sign knew that Cummings continued to be BP's exclusive provider of bullnose signs.  Based on the evidence that Blair Sign spent months, if not years, gearing up to capture all of BP's bull nose business, a reasonable jury could have certainly concluded that Blair Sign intended to cause the termination of the BP/Cummings

business relationship.

### 3. Causation

In two lengthy, related arguments, Blair Sign contends that the jury's verdict on the IIBR claim is not supportable because Cummings failed to demonstrate the causation/damages element of the claim. (Docket No. 212 at 12.) That is, Blair Sign alleges that Cummings failed to show that Blair Sign's actions caused BP to terminate its relationship with Cummings and, moreover, Cummings failed to show "the existence of damages to a reasonable degree of certainty." (See Docket No. 212 at 22-23.)

On the first point, Blair Sign argues that "no reasonable finder of fact could conclude that the alleged 'improper means' utilized by Blair Sign caused the termination of Cummings' relationship with BP." (Docket No. 212 at 12.) That is, as discussed above, Blair Sign argues that Cummings lost its business relationship with BP through its own poor performance and that BP was seeking a new supplier for bull nose signs, and Blair Sign simply happened to fill that role. (*Id.*) At trial, Blair Sign offered the testimony of BP representatives, such as Eric Ulmer, who testified that Cummings was not responsive to BP's requests for information, and Cummings had persistent quality and customer service issues. (See Docket No. 212 at 13-16.) Blair Sign argues that it was already a trusted MID sign supplier, and BP, knowing that it wanted to move away from Cummings as a bull nose supplier, had a logical choice in Blair Sign. (*Id.* at 17.)

Here, despite Blair Sign's arguments, a jury could have reasonably found that there was sufficient causal connection between Blair Sign's improper means and the termination

14

of the relationship to warrant the conclusion that Blair Sign caused the termination.[3]

While BP may have been dissatisfied with certain aspects of Cummings's performance, the

evidence at trial was that BP had been unwilling or unable to locate another sign maker

who could provide the bull nose sign, until Blair Sign offered the opportunity to "take the

business."  As Cummings correctly puts it, "the jury reasonably could conclude that if

Blair Sign had not developed the capability to produce acceptable bull nose products using

Cummings' technical information ... then BP would have ordered them from Cummings

instead."  (Docket No. 225 at 27.)  That is, the evidence plainly showed that Blair Sign's

methods over the period dating from Fall 2004 to Spring 2006 were effective at luring the

bull nose business from Cummings to Blair Sign; the jury, having reasonably concluded

that those methods amounted to "improper means," naturally and reasonably concluded

that Blair Sign's "improper means" resulted in the termination of the relationship.

Blair Sign's other causation argument is that Cummings did not prove "the

existence of damages" flowing from the use of the improper means with a "reasonable

degree of certainty."  (Docket No. 212 at 19.)  Both sides agree that, while Cummings need

---

[3]In briefing, the parties get involved in a side dispute about what "cause" means under *Trau-Med*, that is, whether it means "proximate" cause or "substantial factor" causation, as Cummings contends, or whether it means something akin to "but for" causation, which is, essentially, Blair Sign's argument.  (Docket No. 225 at 24; Docket No. 234 at 16.)  The jury instructions, which neither party objects to here, simply instructed the jury to assess whether any "improper means" "caused the business relationship to end" and "caused damage to Cummings," or, stated another way, whether Cummings suffered damages "as a result of" the improper means.  (Docket No. 201 at 23-25.)  These instructions are consistent with the elements of the tort as outlined in *Trau-Med*, and, as discussed herein, the jury's causation determination was reasonable.

15

not prove its precise amount of damages in order to recover for Blair Sign's conduct, it must prove the *existence* of damages with "reasonable certainty." *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 57 (Tenn. Ct. App. 2005). Blair Sign argues that Cummings could not show the existence of damages with the requisite degree of certainty because, as there was no overarching contract between Cummings and BP after June 2005 and as there were significant problems in the BP/Cummings relationship, "there is no guarantee that Cummings would have continued to receive the bullnose work that Blair Sign ultimately received." (Docket No. 212 at 20.)

Again, while it was clear that BP was not entirely happy with Cummings's product, it was also clear that, prior to Blair Sign's intervention, BP had not found another supplier for this product who could do what Cummings could do. Therefore, despite the end of the Global Purchase Agreement, BP continued to order bull nose work exclusively from Cummings, and, in fact, continued to do so until it was ready to transfer the business to Blair Sign. Therefore, absent Blair Sign's intervention, there is little to indicate that Cummings would not have continued to supply BP's bull nose needs on an indefinite basis. Therefore, it was reasonable for the jury to conclude that Cummings had shown it suffered damages with a "reasonable degree of certainty."

### 4. Summary

Having considered Blair Sign's arguments as to the IIBR claim, it is clear that the jury's verdict on this claim "could reasonably have been reached." Therefore, the court will not disturb the jury's verdict on this claim.

16

**B.      Breach of the Consulting Agreement (Section 6) Claim**

As noted above, in addition to finding that Blair Sign was liable on the IIBR claim, the jury also found that Blair Sign was liable for breaching Section 6 (the non-competition provision) of the Consulting Agreement and awarded Cummings $370,750 for the breach. (See Docket No. 203.)  By way of a simplified review, among other things, Section 6 of the Consulting Agreement prohibited Blair Sign from "contact[ing], or solitic[ing], or acqur[ing] as a customer" any customer of Cummings, during time periods in which Blair Sign had done certain levels of Cummings's subcontract work for that customer.  (See Docket No. 140 Ex. 3 at 15.)

In its post-trial motion, Blair Sign does not challenge the jury's implicit finding that Blair Sign violated the non-competition provision of the Consulting Agreement by soliciting MID sign work from BP in 2003 and 2004.  Indeed, as discussed in the summary judgment Memorandum, it is well established that Blair Sign performed the requisite level of Cummings's sub-contract work for BP in 2003 and 2004 to trigger the restrictions on solicitation raised by Section 6, and it is also well established that Blair Sign did "contact" BP and did "solicit" MID work from BP during this time period.  (See Docket No. 154 at 12.)

Rather, in a similar argument to that raised in regard to the IIBR claim, Blair Sign now argues that no reasonable jury could have found for Cummings on this claim because "no reasonable finder of fact could conclude that the existence of damages was reasonably certain."  (Docket No. 212 at 23.)  That is, notwithstanding Blair Sign's improper contact

17

with BP, "there was no guarantee that Cummings would have continued to receive the MID work that Blair Sign received which served as the basis for Cummings' claim that Blair Sign breached the consulting agreement." (*Id.*)

The jury reasonably concluded that there were damages "reasonably certain" to flow from Blair Sign's improper contact with BP. As Cummings points out, it is undisputed that, during this 2003 to 2004 time period, Cummings and Blair Sign were the only two suppliers of BP MID products. (Docket No. 225 at 20.) There is also no reasonable question that Blair Sign obtained MID sales from BP (sales that would have otherwise gone to Cummings) through its solicitation of BP for those sales – solicitation that was improper under the clear language of Section 6 of the Consulting Agreement. (*Id.*) Therefore, the fact of damages is "reasonably certain," and the court will not disturb the jury's verdict on the breach of the Consulting Agreement claim based on the arguments provided by Blair Sign here.

C. Breach of the Consulting Agreement (Devorris's Claim)

As noted above, Donald Devorris argues that he is entitled to a new trial on his claim that Cummings breached the Consulting Agreement by not paying him his consulting fee for July 2006 and beyond. (Docket No. 212 at 26.) There is no question that Cummings did not pay Devorris his consulting fee for July 2006 or for any date subsequent, despite its facial obligation to do so under the Consulting Agreement.

Throughout this litigation and at trial, Cummings contended that its failure to pay the consulting fees to Devorris should be excused because Devorris failed to "substantially

18

perform" under the Consulting Agreement and because Devorris "first breached" the Consulting Agreement. (*See* **Docket No. 225 at 33.**) That is, Cummings contends that Devorris's failure to provide a deliverable or to provide any sort of timely, good faith response to Cummings's June 5, 2006 request for consulting services in the area of inventory control meant that Devorris had "first breached" the contract and had failed to "substantially perform" the contract, thereby relieving Cummings of its obligations to pay Devorris his consulting fee for July 2006 and for the months thereafter. (*Id.*)

While, in the summary judgment Memorandum, the court implied that the evidence did not provide a valid "first breach" defense for Cummings (Docket No. 154 at 15, 26), the court re-opened this issue during trial based on the (unchallenged) evidence presented. For instance, the testimony of Cummings president and CEO Steve Kerr and Cummings CFO Tony Schofield more clearly illuminated Devorris's extensive delays in responding to Cummings's requests for consulting services and his failure to provide any sort of deliverable or prospect of a deliverable in response to the requests. At the end of the trial, among other things, the jury was properly instructed that "a party who commits the first substantial breach of a contract cannot enforce the contract against the other party, even if the other party fails to abide by the terms of the contract." (Docket No. 201 at 20.) The jury was also properly instructed that implicit in every contract in Tennessee is the duty of good faith and fair dealing, and the failure to perform a contract in good faith and with fairness toward the other parties to the contract may be construed as a breach of that covenant implied in every contract. (*Id.* at 19.)

19

Based on the evidence presented at trial, the jury could have reasonably concluded that Devorris committed the "first breach" of the Consulting Agreement by not acting in good faith and fairly toward Cummings in regards to the "inventory control" request. Indeed, it took Devorris roughly six weeks to confirm that he would, indeed, perform work responsive to the request, and, despite claiming that he had enlisted the help of others in responding to the request, in the roughly seven weeks between the date of the consulting request and the date Devorris filed suit seeking his consulting fee, Devorris and his "team" had only generated a six-page document, which was simply copied from Blair Sign's supply manual. (See Docket No. 225 at 35.)

As Cummings puts it, "the jury reasonably could conclude that Donald Devorris' half-hearted and undelivered consulting services, consisting of those photocopied pages, were insufficient to prove any substantial, good faith performance by Donald Devorris." (Docket No. 225 at 35.) This conclusion is only bolstered by the fact that Devorris sued Cummings for his consulting fee only days after assuring Cummings that he was working on the deliverable. (*Id.*) As the jury's implicit conclusion – that Cummings's failure to pay Devorris's consulting fee was excused by Devorris's conduct – "could reasonably have been reached," the court will not disturb the jury's verdict on this claim.

D.      Punitive Damages

As discussed above, in addition to awarding Cummings $535,486 in compensatory damages on the IIBR claim, the jury also awarded Cummings $2,620,000 in punitive damages on that claim. (Docket Nos. 203 and 205.) Blair Sign now moves to have the court

20

"alter or amend" that award, as, it claims, the current judgment is "so grossly excessive that it violates Due Process."[4]  (Docket No. 212 at 28.)

The Supreme Court's well-established "guideposts" for evaluating the constitutionality of a punitive damages award are: (1) the reprehensibility of the defendant's conduct; (2) the disparity between the plaintiff's harm and the punitive award, which usually considers the "ratio" between the plaintiff's compensatory damages and the punitive damage award; and (3) a comparison of the punitive award to civil penalties in comparable cases.  *Bridgeport Music, Inc. v. Justin Combs Publishing*, 507 F.3d 470, 486 (6th Cir. 2007) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

    1.       Reprehensibility

In *Gore,* the Supreme Court stated: "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  *Gore*, 517 U.S. at 575.  Later, in *State Farm v. Campbell*, the Court

---

[4] As partial support for its argument that the punitive damages award is "grossly excessive," Blair Sign submitted the affidavit of Philip Devorris, who speculated that the current judgment, if enforced, would trigger a series of financial problems at Blair Sign, including the inability of Blair Sign to obtain and maintain its credit, leading to the "likely ... destruction of the business."  (Docket No. 211 Ex. 13 at 2.)  Cummings has moved to strike the affidavit, arguing that Blair Sign's "attempt to try to prove some financial jeopardy" should have been raised during the presentation of evidence regarding punitive damages at trial.  (Docket No. 226 at 2.) Cummings's motion is misplaced; it cites no law precluding a party from offering post-verdict evidence, such as an affidavit, in support of the notion that the punitive damages award is "constitutionally excessive." Moreover, this specific evidence can only be presented post-trial, because the impact of a punitive award on a business cannot be known until after the award is announced.  Therefore, Cummings's motion to strike the affidavit will be denied.

provided five factors to be used in assessing reprehensibility, that is, whether (1) "the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." 538 U.S. at 419. While there is no precise formula for how many of these factors should be present in order to justify a certain award, the Court has stated that "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

More recently, analyzing this line of case law and subsequent Sixth Circuit cases interpreting it, the Sixth Circuit stated that, "where only one of the reprehensibility factors is present, a ratio in the range of 1:1 to 2:1 [punitive:compensatory] is all that due process will allow." *Bridgeport*, 507 F.3d at 487. Here, neither side disputes that, at most, three reprehensibility factors are applicable – financial vulnerability, repeated conduct, and intentional harm.

As to intentional harm, as discussed in detail above, the jury's conclusion that Blair Sign intended to (and did) terminate the business relationship between BP and Cummings using improper and underhanded means was a reasonable one. The Sixth Circuit has indicated that, under this prong of the reprehensibility analysis, deference should be given to the jury's conclusions about the intentionality of the conduct and the necessary

22

inferences therefrom. *Bridgeport*, 507 F.3d at 486. Therefore, this first reprehensibility factor is established.

As to financial vulnerability, Cummings contends that the evidence at trial (which was, among other things, that, in 2006, Cummings lost $300,000 despite $55 million in sales), demonstrates that Cummings was financially vulnerable at the time of Blair Sign's intentional conduct, providing further support for the substantial punitive damages award. (Docket No. 225 at 40.) Blair Sign does not challenge that this economic state rendered Cummings financially vulnerable, but, instead, contends that "Blair Sign was not aware that Cummings was suffering from any financial vulnerability" and that Blair Sign did not learn of Cummings's "financial hardships" until the time of trial. (Docket No. 212 at 29.)

In response, Cummings contends that there is no requirement that Blair Sign know of Cummings's financial vulnerability for this factor to apply in support of the punitive damage award. (Docket No. 225 at 41.) Indeed, in *Bach v. First Union Nat'l Bank*, the Sixth Circuit concluded that this factor "requires only that the target be financially vulnerable." 149 Fed. Appx. 354, 365 (6th Cir. 2005). Blair Sign concedes that this statement appears in *Bach*, but contends that the issue of whether the defendant has to know of the plaintiff's financial vulnerability was not before the court in *Bach*, and, moreover, in order "to accomplish the purpose of punitive damages – punishment and deterrence – ... knowledge of the plaintiff's financial vulnerability is crucial ... it is nonsensical to impose punitive damages on Blair Sign to deter Blair Sign from inflicting economic harm on a financially vulnerable competitor when Blair Sign had no knowledge

of the competitor's financial vulnerability."  (Docket No. 234 at 20-21.)

   To some extent, both parties miss the mark on this argument.  The Sixth Circuit addressed the issue of financial vulnerability in the *Bridgeport* case.  There, a small record company sued a larger record company, claiming that the defendant had committed copyright infringement by improperly sampling one of the plaintiff's songs.  *See Bridgeport*, 507 F.3d at 475-77.  The jury found for the plaintiff and awarded compensatory and punitive damages, and the defendants challenged the punitive award under *Gore*.  *Id.* at 486.  Despite the disparity in the size of the two companies, the Sixth Circuit concluded that the plaintiff was not "a financially vulnerable victim," but was rather an established company that had repeatedly shown its ability to "protect its rights in the courts."  *Id.* at 487.

   Moreover, in *Bach*, a case upon which Cummings relies in support of its financial vulnerability argument, the plaintiff was found to be "financially vulnerable" because she was a seventy-seven-year-old widow who was an unwitting victim of identity theft.  149 Fed. Appx. at 357-65.  It suffices to say that a party is not "financially vulnerable," as the Sixth Circuit has used the term, simply because it had some mildly unprofitable years.  Cummings is a large company with a substantial client base and revenue stream and has been able to retain counsel from one of the largest firms in the mid-South.  Cummings is not financially vulnerable, and, therefore, this factor does not apply.

   The final relevant consideration here is whether the conduct was "isolated" or "repeated."  (See Docket No. 225 at 41.)  In *Bach*, the Sixth Circuit stated: "it appears that

24

the Supreme Court has interpreted this factor to require that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with the plaintiff." *Bach*, 149 Fed. Appx. at 365. This conclusion has been repeated in subsequent Sixth Circuit cases. *See Bridgeport*, 507 F.3d at 487. As there was no evidence that Blair Sign's conduct was repeated as to "various different parties," this factor does not apply.

As is clear from the analysis above, only one of the reprehensibility factors is relevant here. Therefore, under the plain language of *Bridgeport*, "a ratio in the range of 1:1 to 2:1 is all that due process will allow." 507 F.3d at 487. The analysis does not end here, however. In *Bridgeport*, after noting that the range of potential punitive awards was substantially reduced because only one reprehensibility factor was applicable, the court went on to consider the "disparity" and "comparison" guideposts in order to glean the appropriate award.

### 2. Disparity/Ratio

In *Bridgeport*, the court cited three indicators that the disparity, or ratio between the punitive award and the compensatory award, was constitutionally impermissible. The first such indicator is that the ratio is simply too high. As the court noted in *Bridgeport*, "[a]lthough the Supreme Court has repeatedly rejected the use of bright-line rules, it has cautioned that 'few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.'" 507 F.3d at 488 (quoting *State Farm*, 538 U.S. at 425). Indeed, "an award of more than four times the

amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* Here, the ratio of punitive damages to compensatory damages is 4.89 to 1, which, standing alone, would be "close," if not over, "the line of constitutional impropriety."

The second such indicator is that "the compensatory damage award itself is very large." *Id.* As the court noted in *Bridgeport*, "the Supreme Court has made clear that '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'" *Id.* (quoting *State Farm*, 538 U.S. at 425). The Sixth Circuit has concluded that compensatory awards in the $400,000 range may fairly be considered "large" or "substantial." *Id.* Here, the compensatory award was $535,486, which is indisputably "large" or "substantial," and, therefore, based on the case law above, a punitive award much above the compensatory award in this case would likely not be consonant with due process.

The final such indicator is that the compensatory award includes a "punitive element." *Id.* Discussing *State Farm*, the *Bridgeport* court stated that "the Supreme Court noted that a large punitive damages award is not justified where a compensatory damages award includes a punitive element that is duplicated in the punitive damages award." *Id.* Here, this indicator does not appear to negatively impact the award. As Cummings points out, the jury awarded the precise amount of "lost profits from lost sales of bull nose products" to which Cummings CFO Tony Schofield had testified. (Docket No. 225 at 18.) Therefore, there does not appear to be a "punitive element" to the jury's compensatory award here. That said, a review of the "disparity/ratio" guidepost and the relevant indicia

26

of constitutional impropriety further shows that the punitive damages award in this case is too high.

### 3. Civil penalties comparison

Blair Sign argues that the excessiveness of the punitive award is further amplified by a comparison of civil penalties authorized or imposed in comparable cases. (Docket No. 212 at 34.) Blair Sign points out that the "Tennessee Legislature has authorized an award of [only] up to three times the compensatory damages for inducing a breach of contract." (*Id.* citing T.C.A. § 47-50-109.) Moreover, Blair Sign points to a recent Tennessee state court case involving an IIBR claim, in which the court noted, without objection, a punitive award of just 2.3 times the compensatory damages. (*Id.* citing *Watson's Carpet & Floor Covering, Inc. v. McCormick*, 247 S.W. 3d 169, 174 (Tenn. Ct. App. 2007)). In response, Cummings only addresses the statutory comparison, arguing that Tennessee permits the plaintiff to elect the remedial scheme (statutory damages or punitive damages) that affords the greatest recovery. (Docket No. 225 at 46, citing *Cambio Health Solutions, LLC v. Reardon*, 234 Fed. Appx. 331, 339-40 (6th Cir. 2007)).[5]

---

[5] Cummings points out that, in *Cambio*, the Sixth Circuit upheld a punitive award that was in a 5.65 to 1 ratio with the compensatory award for the plaintiff's tortious interference with contract claim. (Docket No. 225 at 45.) *Cambio* is distinguishable for a few reasons. One, the court found that the conduct at issue could be considered "malicious" and "not isolated," indicating that more than one reprehensibility factor was applicable. 234 Fed Appx at 339. Also, the court noted that the defendants had barely challenged their punitive damages liability under the first two guideposts, "plac[ing] most of their eggs in the third-guidepost basket." *Id.* *Bridgeport* provides a better guide here because it is more recent case law that directly discusses how the district court should weigh the reprehensibility factors and disparity indicia to determine whether a punitive award is consistent with due process.

27

Much of this discussion is academic in light of the findings under the first two guideposts. The Sixth Circuit is explicit – where, as here, there is only a single applicable reprehensibility factor, the ratio of punitive damages to compensatory damages may not exceed 2:1. Further, where, as here, the compensatory award is "substantial" or "large," a ratio exceeding 1:1 approaches the "outer limit" of due process. Therefore, the jury's award here, which is punitive damages in a ratio of 4.89 to 1, is too high. In light of the case law and the facts discussed herein, a punitive award that is in a 1 to 1 ratio with the compensatory award on the IIBR claim is appropriate but also as far as due process will allow. Therefore, the court will enter a judgment reducing the punitive damage award in this case from $2,620,000 to $535,486.[6]

_____

[6] Cummings refers to the court's statement immediately following the jury's punitive damages verdict, which was, in essence, that because the jury's punitive award was in a single-digit ratio to the compensatory damages award, the award was line with the guidance provided by the Supreme Court and, therefore, would not be set aside. (Docket No. 225 at 37.) That statement, of course, in no way foreclosed the possibility that further briefing on and research into the issue might show the incompatibility of the award with due process principles.

28

# CONCLUSION

For the reasons discussed above, the court will enter a judgment reducing the punitive damage award in this case from $2,620,000 to $535,486, which is the maximum amount due process will permit in this case.[7]  Otherwise, Blair Sign's and Donald Devorris's motion for post-trial relief will be denied.  Cummings's motion to strike the affidavit of Philip Devorris will also be denied.

---

[7] When a court invokes its *discretion* and reduces a jury award, the plaintiff should have the opportunity to either accept the award or have a new trial; however, "upon determination of the constitutional limit on a particular award, the district court may enter a judgment for that amount as a matter of law."  *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999).  Indeed, "a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause." *Id.*  The Sixth Circuit likewise appears to recognize that a court, recognizing the constitutionally permissible damage amount, should enter an order awarding that amount.  *See Morgan v. New York Life Ins. Co.*, 559 F.3d 425, 443 (6th Cir. 2009)("we will vacate the award and remand the case to the district court for an order of remittitur that will set the punitive damages in an amount that it determines is compatible with due process, not to exceed the amount of compensatory damages."); *Clark v. Chrysler Corp*, 436 F.3d 594, 611 (6th Cir. 2006) (remanding "to the district court with instructions to enter an order of remittitur as to punitive damages in the amount of $471,258.26.").  The court located one case, *Romanski v. Detroit Entertainment*, in which, the Sixth Circuit, finding the jury's punitive damage award to be constitutionally excessive, stated that the "district court must give [the plaintiff] the option of agreeing to remit $275,000 and to accept a $600,000 punitive damages award or to proceed with a new trial on the issue of damages."  428 F.3d 629, 650 (6th Cir. 2005).  Notably, *Romanski* pre-dates both Sixth Circuit cases discussed above, and the court was not entirely clear as to whether $600,000 was the constitutional limit on the permissible award; rather the court stated, "we think an award of no greater than $600,000 ... would satisfy the demands of the due process clause." *Id.* at 649.  Moreover, a new trial on punitive damages could not benefit Cummings.  The court has determined the maximum permissible constitutional award and, therefore, "[g]iving [the] plaintiff [Cummings] the option of a new trial rather than accepting the constitutional maximum for this case would be of no value. If, on a new trial, the plaintiff was awarded punitive damages *less* than the constitutional maximum, [Cummings] would have lost. If the plaintiff obtained *more* than the constitutional maximum, the award could not be sustained. Thus, a new trial provides only a 'heads the defendant wins; tails the plaintiff loses' option."  *Johansen*, 170 F. 3d at 1332 (emphasis in original).

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

Case 3:06-cv-00890   Document 239   Filed 08/17/09   Page 30 of 30 PageID #: 5191