IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CUMMINGS INCORPORATED, THE INTERNATIONAL SIGN SERVICE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:06-0890 |
| BP PRODUCTS NORTH AMERICA, INC., BLAIR SIGN COMPANY and DONALD DEVORRIS, | ) ) ) ) ) | Judge Trauger |
| Defendants. | ) ) ) | |

*CONSOLIDATED WITH:*

| | | |
|---|---|---|
| DONALD DEVORRIS, | ) ) | |
| Plaintiff, | ) ) ) ) | Case No. 3:07-0834 |
| v. | ) ) ) | Judge Trauger |
| CUMMINGS INCORPORATED, THE INTERNATIONAL SIGN SERVICE, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the court is a Rule 59(e) Motion to Alter or Amend the Order Reducing the Jury's Punitive Damages Award filed by the plaintiff Cummings Incorporated, the International Sign Service ("Cummings") (Docket No. 241). The defendant, Blair Sign Company ("Blair Sign") has responded (Docket No. 244) and, for the reasons discussed herein,

1

this motion will be denied.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A broad and thorough overview of the facts of this protracted dispute between two sign manufacturers was provided in the court's lengthy Memorandum that ruled on the summary judgment motions in this case and a similar review was provided in the court's more recent Memorandum that ruled on the post-trial motions. (See Docket Nos. 154 and 239.) That said, a brief factual overview to give context to the present dispute is appropriate.[1]

The trial of this matter commenced on May 26, 2009, and, on June 2, 2009, the jury began deliberations regarding liability and compensatory damages. On the afternoon of the 2nd, Philip Devorris, who is the Chief Executive Officer and the President of Blair Sign and who had been present at the trial up until this point, left this District to attend a "business meeting." On the evening of the 2nd, the jury requested a recess for the night, which the court granted. At that point, outside of the presence of the jury, counsel for Blair Sign informed counsel for Cummings and the court that Philip Devorris had pressing business matters to which he had to attend and that he would not return for the remainder of the trial. Consistent with the court's memory of the events, Blair Sign points out that Cummings did not, at that time, raise an objection or indicate that Philip Devorris's absence going forward would hinder the development of its case.

The next day, after deliberating for several more hours, the jury returned a verdict that, among other things, awarded Cummings $535,486 on its claim that Blair Sign had intentionally

---

[1] Unless otherwise noted, the facts are drawn from the parties' briefing on this motion, along with the court's own memory of, and notes from, the relevant events.

interfered with Cummings's business relationship with BP (the "IIBR" claim). (Docket No. 203.) Because the jury concluded that Blair Sign had acted "either intentionally, recklessly, maliciously or fraudulently" in the course of this interference, the trial proceeded to the punitive damages stage. (*See id.*) This stage commenced almost immediately after the jury's verdict and lasted about an hour.

During the punitive damages stage of the proceedings, Cummings called Philip Devorris who, of course, was not in court, as a witness. Cummings requested an instruction be given to the jury that, pursuant to Local Rule 39.01, Philip Devorris, as corporate representative of defendant Blair Sign, was required to be present at trial, absent prior approval of absence by the court. The court granted Cummings's request and the court informed the jury that Philip Devorris was absent without permission of the court, in violation of the court's local rules. Again, consistent with the court's memory of the events, Blair Sign points out that Cummings did not, at that time, request any additional instructions or relief.

As noted above, the punitive damages stage of the trial was brief. A stipulation was entered as to Blair Sign's net worth, Cummings's CFO Tony Schofield offered testimony that mostly focused on Blair Sign's failure to engage in meaningful settlement discussions of this matter, and both parties engaged in further argument to the jury. During this argument, counsel for Cummings made repeated references to the disrespect that Philip Devorris had shown the proceedings by absenting himself from the trial without court permission, in violation of court rules. During argument, counsel for Blair Sign did not attempt to excuse Philip Devorris's absence. After argument, the jury retired again to consider the amount of punitive damages that

3

should be awarded. After brief deliberations, the jury awarded Cummings $2,620,000 in punitive damages as further punishment for Blair Sign's intentional interference with business relations. (Docket No. 205.)

On June 17, 2009, Blair Sign filed a motion seeking various forms of post-trial relief. (Docket No. 211.) Among other things, Blair Sign sought a reduction of the punitive damages award, arguing that the award was constitutionally excessive and that enforcing it would violate Blair Sign's due process rights. (Docket No. 212 at 28-36.) Applying settled Supreme Court and Sixth Circuit law, the court concluded that Blair Sign was correct in this regard, and, on August 17, 2009, the court entered an Order reducing the punitive damages award to $535,486, that is, to an amount in a 1-to-1 ratio with the compensatory damages award on the IIBR claim. (Docket No. 240.) Specifically, the court concluded that, because only one of the recognized "reprehensibility" factors was present and because the compensatory award was "substantial," due process limitations would not permit a punitive damages award that exceeded the compensatory award on the IIBR claim. (Docket No. 239 at 25-28.)

On August 31, 2009, Cummings filed the pending Motion to Alter or Amend, arguing that the court erred in reducing in the punitive damages award. Cummings's primary argument is that, because Philip Devorris was, by choice, not available to testify at the punitive damages stage of the trial, the court should draw inferences against Blair Sign as to what the nature of Philip Devorris's testimony would have been, inferences that, according to Cummings, would be sufficient to show that Blair Sign's conduct was reprehensible enough to sustain the jury's original punitive damages award.

4

## ANALYSIS

### I. Standard of Review – Motion to Alter or Amend

A court should grant a motion under Rule 59(e) to "alter or amend" a judgment when there has been a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice. *GenCorp., Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999). A "manifest injustice" is "an error in the trial court that is direct, obvious, and observable, such as a defendant's guilty plea that is involuntary." *McDaniel v. Am. Gen. Fin. Servs. Inc.*, 2007 WL 2084277, *2 (W.D. Tenn. July 17, 2007)(internal quotation omitted). Generally, relief under Rule 59(e) is an "extraordinary remedy" restricted to those circumstances in which the moving party has set forth facts or law of a "strongly convincing nature" that indicate that the court's prior ruling should be reversed. *Id.* Here, Cummings contends that "it is a manifest injustice to reduce the jury's punitive damages award when Blair Sign's designated corporate representative, rather than testifying when called to do so during the punitive damages phase of the trial, had abandoned it without leave of court." (Docket No. 242 at 5.)

### II. Whether the Punitive Damages Award Should be Restored

As is clear from the court's most recent Memorandum, the court's conclusion that the punitive damages award should be reduced in this case rested on two main points. First, of the three potentially relevant reprehensibility factors established by the Supreme Court in *State Farm v. Campbell*, 538 U.S. 408 (2003) (intentional harm, repeated conduct, and financial vulnerability) only intentional harm had been demonstrated, and "where only one of the

5

reprehensibility factors is present, a ratio in the range of 1:1 to 2:1 [punitive:compensatory] is all that due process will allow." *Bridgeport Music, Inc. v. Justin Combs Publishing*, 507 F.3d 470, 487 (6th Cir. 2007). Second, the compensatory award on the IIBR claim was $535,486 – an amount that well exceeds that which the Sixth Circuit has concluded is "substantial" and, "[w]hen compensatory damages are substantial ... a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'" *Id.* (quoting *State Farm*, 538 U.S. at 425).

As indicated above, Cummings's primary argument is that the court should infer that more than one reprehensibility factor would have been established had Philip Devorris testified in the punitive damages stage of the proceedings. As Blair Sign points out, this argument, even if it has merit, does not change the fact that the court found that Cummings had already received a "substantial" compensatory award on the IIBR claim, and, therefore, a punitive damages award in a 1-to-1 ratio with this compensatory award would still, under *Bridgeport* and *State Farm*, be at the "outermost limit" of due process. In challenging this position, Cummings argues that "what is large or substantial is relative and not subject to a finite benchmark" and that "*Bridgeport* does not apply if there exists two or more reprehensibility factors." (Docket No. 242 at 4.)

Importantly, nothing in the court's review of *Bridgeport Music* indicates that, in order to reduce the punitive damages award based on the notion that it is out of balance with a "substantial" compensatory damage award, there must be, at most, a single reprehensibility factor present. Also, as discussed in the court's recent Memorandum, in similar cases, the Sixth

6

Circuit has concluded that awards significantly less than the compensatory award on the IIBR claim were "substantial," making this court's conclusion as to the compensatory award on the IIBR claim entirely appropriate under Sixth Circuit precedent. (*See* Docket No. 239 at 26.) That said, *Bridgeport Music* does not completely foreclose the possibility of the combination of a "substantial" compensatory award and a punitive damages award that is in excess of the 1-to-1 ratio, and, therefore, it is worth considering Cummings's argument that additional reprehensibility factors should have been inferred through Philip Devorris's failure to testify at the punitive damages proceeding.

In essence, Cummings contends that the recent confluence of events has been unfair. That is, by choosing to be unavailable during the punitive damages stage, Philip Devorris avoided questioning on key issues that could have, potentially, established other *State Farm* reprehensibility factors, most notably "repeated conduct."[2] (*Id*. at 6.) Cummings contends that, by reducing the punitive damages award on the theory that only a single reprehensibility factor (intentional harm) was established, the court is rewarding Blair Sign's alleged "gamble that contempt of Local Rule 39.01(b) was a better alternative for its pocketbook than further

---

[2]Cummings primarily argues that the court should infer that Philip Devorris's testimony would have established "repeated conduct," as the second reprehensibility factor, although Cummings, in passing, mentions "financial vulnerability" as well. (Docket No. 241 at 1.) The court discusses "repeated conduct" at greater length because it is at least somewhat clear, in theory, how Philip Devorris's testimony could have established that Blair Sign engaged in repeated, similar conduct. It is less clear how Philip Devorris's testimony at the punitive damages stage might have established that Cummings was financially vulnerable, when, as discussed in the court's recent Memorandum, "Cummings is a large company with a substantial client base and revenue stream and has been able to retain counsel from one of the largest firms in the mid-South," all of which demonstrates that "Cummings is not financially vulnerable." (Docket No. 239 at 24.)

7

questioning by Cummings." (Docket No. 242 at 6.) Cummings contends that two legal theories, adverse inference and forfeiture by wrongdoing, support its position.

### A. Adverse Inference

Cummings argues that because, in the initial post-trial briefing, Cummings had the benefit of reasonable inferences in its favor, the court, in reviewing that briefing, should have applied the doctrine of "adverse inference" against Blair Sign. (Docket No. 242 at 8.) Cummings cites two cases, one from Tennessee state court and one from the Sixth Circuit, for the proposition that adverse inference is recognized by the courts in this state.

In *S.S. Services, Inc. v. Rothwell*, the Tennessee Court of Appeals recognized that, "while a fact finder may draw an adverse inference from the absence of a party or witness, the rule should be strictly construed to avoid giving undue weight to the failure of their testimony ... [the court] must make an informed decision about the witness's availability, the witness's capability to elucidate the transaction at issue, and whether a relationship exists between witness and a party that would incline the witness to favor the party." 1992 WL 90623, *3 (Tenn. Ct. App. May 5, 1992).

Consistent with this, in *Yuk Shau Mui v. Wing*, the Sixth Circuit noted that, "when it would be natural under the circumstances for a party to take the stand himself as a witness in a civil case and he fails to do so, tradition had allowed his adversary to use this failure as the basis for invoking an adverse inference. ... The classic formulation of the rule is that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if

8

produced, would be unfavorable." 1987 WL 38041, *2 (6th Cir. July 10, 1987)(internal citations and quotations omitted). Cummings also cites a series of cases from a somewhat different context that hold that, in a civil proceeding, an adverse inference may be drawn by the fact finder from a witness's assertion of the Fifth Amendment right against self-incrimination. (*See* Docket No. 242 at 10, collecting cases).

Cummings contends that it was certainly within Blair Sign's power to produce its CEO and President, and Philip Devorris had a unique ability to elucidate the other instances of intentional interference with business relationships engaged in by Blair Sign. (Docket No. 242 at 8-9.) Under the case law discussed above, Cummings argues that the court should make the inference, adverse to Blair Sign, that Philip Devorris left the District because he otherwise would have had to testify to similar acts of interference, which would have established a second reprehensibility factor under *Bridgeport Music*, thereby permitting a punitive damages award exceeding the 1-to-1 ratio. (*Id.*) Cummings argues that any suggestion that Philip Devorris would have denied that Blair Sign's conduct was "repeated" is "wildly speculative" and, even if he had attempted to deny that the conduct was "repeated," he would have been exposed to vigorous questioning and challenges to his credibility, all of which would have undermined this testimony. (*Id.*)

Notably absent from Cummings's analysis is any suggestion that Blair Sign actually engaged in "repeated" conduct that would establish this reprehensibility factor. As discussed in the recent Memorandum, this factor requires "that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the

9

single transaction with the plaintiff." (Docket No. 239 at 24 citing *Bridgeport Music*, 507 F.3d at 487.) Through two rounds of post-trial briefing Cummings has made no attempt to establish that Blair Sign actually engaged in this brand of "repeated" conduct, and, therefore, as the court concluded in its recent Memorandum, there is "no evidence that Blair Sign's conduct was repeated as to 'various different parties.'"[3] (*Id.* at 25.)

The case law cited above indicates that, under certain circumstances, the court may draw a generalized adverse inference from the failure of a witness to testify. It is also true that, in the punitive damages stage of a trial, a court may draw inferences, adverse to the defendant, about the defendant's net worth, if the defendant fails to put forth specific evidence of net worth, and the plaintiff has come forth with some such evidence. *See e.g. Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 84 (2nd Cir. 2007); *Meitler Consulting, Inc. v. Dooley*, 2007 WL 1834008, *12 (D. Kan. June 26, 2007).

That said, particularly in light of the cautions contained in the case law about giving "undue weight" to the failure to testify, there appears to be no support for the grand leap Cummings encourages the court to make. As is clear from the case law above, a court makes a sage use of the adverse inference doctrine when it either affords generalized, mild weight to a party's failure to testify in a civil matter or when the court gives enhanced weight to evidence

---

[3] While Cummings suggests that the court should have discussed Philip Devorris's failure to attend the punitive damages stage in its recent Memorandum, this issue was hardly prominent in Cummings's post-trial briefing. (Docket No. 242 at 2.) Indeed, despite filing a 50-page brief in response to Blair Sign's motion for post-trial relief, Cummings only briefly mentioned Philip Devorris's absence in passing, indicating that his absence somehow added to the overall reprehensibility of Blair Sign's conduct by showing "obvious disrespect" for the proceedings. (Docket No. 225 at 43.)

10

submitted by one party that, despite an opportunity, has not been controverted by the other party, such as in the context of establishing net worth. On the other side, a court clearly would put "undue weight" on the principle of adverse inference if it used the doctrine to draw unsupported, unrelated, and unreasonable conclusions from a party's failure to testify. The court can simply detect no connection between Philip Devorris's failure to attend the punitive damages stage of the trial and the prospect that Blair Sign had engaged in "related" previous instances of improper interference with business relationships. In the absence of any such connection, it is not appropriate to draw the inference Cummings seeks here.[4]

### B. Forfeiture by Wrongdoing

Additionally, Cummings argues that, unless the punitive damages award is restored, a litigant (Blair Sign) "[would] profit from its own voluntary wrongdoing," which is generally recognized as a prospect that fairness and equity should not allow. (Docket No. 242 at 11 citing *UAW v. NLRB*, 459 F.2d 1329,1332 (D.C. Cir. 1979)). Blair Sign refers to the case law cited by Cummings here as a "bit of a mockery," in that Cummings relies on cases, such as the Supreme Court's recent decision in *Giles*, which arise in an entirely different context. (Docket No. 244 at 13.) For instance, in *Giles*, the Supreme Court noted that a criminal defendant can forfeit the constitutional right to confront a witness in a criminal trial if the defendant intended to (and did) cause the witness's unavailability through homicide. *See e.g. Giles v. California*, 2008 S.Ct.

---

[4] It is also worth noting that Cummings was free to request that the court give an adverse inference instruction (such as T.P.I. - Civil 2.04) as part of the punitive damages instructions, if it felt that Philip Devorris's absence was so detrimental to its punitive damages proof. It did not do so.

11

2678, 2687 (2008).

The context of these cases notwithstanding, Cummings contends that the broad forfeiture maxims discussed therein, which basically stand for the proposition that no one should be permitted to benefit from his own wrong, should be applied here to prevent Blair Sign from profiting from its wrongdoing. Again, Cummings's arguments are somewhat unmoored from the reality of this case. There is nothing to suggest that Philip Devorris left the trial early in an effort to avoid testimony in the punitive damages stage of the proceedings. Philip Devorris attended every day of the trial and gave lengthy trial testimony, along with an extremely lengthy deposition during discovery. Also, as discussed above, there is no indication that, had he stayed to testify, he would have testified to any "repeated" conduct such that a second reprehensibility factor would have been established.

Moreover, as Blair Sign points out, at least during the punitive damages stage of the trial, Cummings was, in some ways, helped by Philip Devorris's non-attendance, in that Cummings was able to exploit his apparent disinterest in the proceedings as support for its position that Philip Devorris was a defiant individual who deserved to be punished. (Docket No. 244 at 19.) Therefore, while Cummings repeatedly contends that Philip Devorris's non-attendance saved Blair Sign more than $2 million, it is not unreasonable to assume that a primary reason for the large punitive damages award was that the jury appreciated the closing argument of counsel for Cummings that Philip Devorris was "arrogant," "defiant," and "calculating," as had been demonstrated by his absence.

**C.     Summary**

In sum, Cummings has failed to show that the court made a "direct, obvious, and observable" error in reducing the punitive damages award in this case. Rather, Cummings has put forth an uncompelling argument that the court, essentially *sua sponte*, should have (1) inferred a second reprehensibility factor from Philip Devorris's failure to testify at the punitive damages stage of the proceedings and (2) should have used that inference as a basis for not reducing the punitive damages award. Again, even if the court were inclined to draw an "adverse inference" here or was inclined to believe that Blair Sign was seeking to profit from its own wrong, there would still be a "substantial" punitive damage award in this case, which would strongly suggest a maximum award ratio of 1-to-1. Furthermore, the lack of any demonstrated connection, circumstantial or otherwise, between Philip Devorris's departure from the District near the end of the trial and the notion that Blair Sign engaged in "repeated" conduct precludes any adverse inference or equitable remedy suggested by Cummings.

## CONCLUSION

For the reasons discussed above, Cummings's Motion to Alter or Amend will be denied. An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

13