IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CUMMINGS INCORPORATED, THE ) <br> INTERNATIONAL SIGN SERVICE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BP PRODUCTS NORTH AMERICA, INC., ) <br> BLAIR SIGN COMPANY and DONALD ) <br> DEVORRIS, ) <br> ) <br> Defendants. ) <br> ) | Case No. 3:06-0890 <br> Judge Trauger |

_CONSOLIDATED WITH:_

| | |
|---|---|
| DONALD DEVORRIS, ) <br> ) <br> Plaintiff, ) <br> ) <br> ) <br> ) <br> v. ) <br> ) <br> CUMMINGS INCORPORATED, THE ) <br> INTERNATIONAL SIGN SERVICE, ) <br> ) <br> Defendant. ) | Case No. 3:07-0834 <br> Judge Trauger |

**MEMORANDUM**

Pending before the court are a Motion for Attorneys' Fees [with supplements] (Docket Nos. 247 and 259) filed by the plaintiff Cummings Incorporated, the International Sign Service ("Cummings"), and a Motion to Strike Inadmissible Evidence filed by Blair Sign Company ("Blair Sign") and Donald Devorris ("the defendants") (Docket No. 285). There is no dispute

1

that, under the parties' Consulting Agreement, Cummings is entitled to some measure of attorneys' fees stemming from its victory in the underlying litigation. The dispute is as to the precise amount. For the reasons discussed below, the court will award $908,515.80. The Motion to Strike will be denied.[1]

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This is the fifth substantive memorandum that the court has issued in response to motion practice in this protracted litigation in the last sixteen months. (*See* Docket Nos. 154, 239, 245, 288.) As has been previously discussed in more detail, Cummings is a sign manufacturing company based in Nashville, Tennessee. Blair Sign is a sign manufacturing company based in Altoona, Pennsylvania and Donald Devorris is the founder and chairman of The Blair Companies, which is a collection of businesses, the largest of which is Blair Sign.

---

[1] In the Motion to Strike, the defendants argue that the court should "strike" or, in essence, ignore, Cummings' arguments (1) that Cummings attempted to settle this dispute and (2) that the defendants "aggressively litigated" this case. (Docket No. 286 at 2-4.) As to the first category, the defendants contend that Federal Rule of Evidence 408 prohibits the consideration of evidence of attempts to settle a matter. While Rule 408 does prohibit the admission of settlement negotiation evidence "offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount," evidence of settlement negotiations is admissible for other purposes and, as Cummings points out, numerous courts have rejected the precise argument that the defendants advance here, that is, they find that a court may consider settlement discussions in calculating an attorneys' fee award. *See* Fed R. Evid. 408; *Lohman v. Duryea Borough*, 574 F.3d 163, 167-168 (3rd Cir. 2009); *Smith v. Dunmore*, 2008 WL 4542246, *12 (M.D. Pa. Oct. 9, 2008); *Ollis v. Hearthstone Homes, Inc.*, 2006 WL 1700077, *5 (D. Neb. Jun. 12, 2006). As to the second issue, the defendants argue that the court should not consider evidence of "aggressive" litigation because it is not relevant under Fed. R. Evid. 401 and "unfairly prejudicial" under Rule 403. (Docket No. 286 at 3.) If available, evidence that the defendants engaged in dilatory tactics could be relevant to understanding aspects of Cummings' fee request. Moreover, contrary to the defendants' suggestion that the court needs to strike all of this information from its mind in deciding the attorneys' fee award, the court is capable of giving the appropriate weight to the evidence.

2

The parties used to be "friendly rivals" in the sign making business, but, in 2006, a dispute arose. Cummings claimed that Blair Sign had improperly interfered with its business relationship with BP Products North America ("BP") and that Blair Sign had breached the Consulting Agreement in place between Cummings and the defendants by soliciting business from BP in violation of that agreement. The defendants argued that Cummings had failed to pay Donald Devorris the monthly consulting fee as required under the Consulting Agreement.

In July 2006, Devorris sued Cummings in Pennsylvania state court for breach of the Consulting Agreement. In August 2006, Cummings sued BP and the defendants in Tennessee state court, asserting, among other things, six causes of action against Blair Sign and four causes of action against BP. (Docket No. 1 Ex. 1.) The Tennessee state litigation was removed to this court in September 2006. (Docket No. 1.) The Pennsylvania litigation was transferred to this court in August 2007, and the cases were consolidated in October 2007. (Docket No. 82.) Following a settlement conference between the parties on July 19, 2007, BP and Cummings reached a settlement in principle. (Docket No. 55.) Several weeks later, on August 28, 2007, Cummings and BP filed a "Joint Notice of Dismissal with Prejudice" (Docket No. 61) and BP was dismissed from the litigation on September 5, 2007. (Docket No. 66).

After intensive discovery between the remaining parties, in December 2008, the court ruled on cross-motions for summary judgment, granting summary judgment for the defendants on four of the six claims asserted by Cummings and allowing Cummings to proceed to trial with its breach of Consulting Agreement claim and its intentional interference with business relations

3

("IIBR") claim against Blair Sign. (Docket No. 155.) The court also ruled that Devorris's breach of Consulting Agreement claim against Cummings should proceed to trial. (*Id.*)

After a six-day jury trial, Cummings prevailed. The jury awarded Cummings $370,750 on its breach of Consulting Agreement claim and $535,486 on its IIBR claim, while finding that Cummings did not breach the Consulting Agreement as to Donald Devorris, presumably because the jury determined that Devorris "first breached" the Consulting Agreement, and, therefore, Cummings was not responsible for non-payment of consulting fees. (Docket No. 203; Docket No. 239 at 18-20.) At the punitive damages stage of the proceedings, the jury awarded Cummings $2,620,000 on the IIBR claim. (Docket No. 205.)

The defendants filed a motion for post-trial relief. (Docket No. 211.) By Order entered August 17, 2009, the court largely denied that motion, but did, consistent with due process guidelines, reduce the punitive damage award from $2,620,000 to $535,486. (Docket No. 240.) On August 31, 2009, Cummings filed a motion to reconsider that decision, which the court denied. (Docket Nos. 241, 246.)

The Consulting Agreement contains a provision that states that, "in the event either party prevails in any action, suit or proceeding to enforce his or its rights hereunder, the non-prevailing party agrees to pay all of such prevailing party's reasonable attorneys' fees incurred in connection with such action, suit or proceeding." (Docket No. 260 Ex. 1 at 5.) Therefore, the fact that the prevailing party would seek attorneys' fees in this case has been well known throughout the proceedings. (*See* Docket No. 263 Ex. D at 2.)(April 2, 2008 e-mail from Blair Sign's Philip Devorris to Cummings CEO Stephen Kerr predicting that Blair Sign and Donald

4

Devorris would prevail in the underlying litigation and that Blair Sign would "recover our substantial legal fees.")

Consistent with the court's orders, on October 28, 2009, Cummings filed a "bare bones" Motion for Attorneys' Fees and Expenses, seeking $1,075,563.50 in fees from the defendants but providing nothing in the way of evidentiary support for that figure. (Docket No. 247 at 3.) On December 16, 2009, Cummings filed the required supplement to its original motion, which increased the amount sought based upon the additional work that had been performed since the date of the "bare bones" filing. This filing also included a Memorandum explaining the legal arguments in support of the fee award and declarations from three members of Cummings' legal team, that is, Robert Boston, Derek Edwards, and Robb Harvey from the law firm of Waller, Lansden, Dortch & Davis, LLP ("Waller"). (Docket No. 260-262, 265.) The declarations all discuss the work done by counsel and the challenges posed by this complicated litigation.[2]

Attached to Mr. Harvey's declaration are the monthly invoices that Waller sent to Cummings in connection with Waller's work on this matter. (Docket No. 265 Ex. 2.) Consistent with standard time-keeping and billing practices employed by large law firms such as Waller, each invoice consists of a long list of task descriptions. In each (dated) task description, the attorney or legal staff member describes the work that he or she performed and notes the length of time that the task took. Based upon each individual's hourly billing rate, a monthly

---

[2]Also included is a declaration from Kerr, which discusses his personal efforts to settle this matter prior to trial (Docket No. 263), and a brief declaration from Stephen A. Riley, a Nashville-based attorney with more than thirty years of litigation experience, who stated that the fees sought by Waller in this matter are reasonable. (Docket No. 264.)

5

invoice was generated and, Waller claims, the sum total of all of the monthly invoices in this case was $1,183,577.30. (Docket No. 265 Ex. 1.) As discussed below, Waller argues that it is entitled to the vast majority of that amount.

The defendants, while conceding the applicability of the attorneys' fee provision in the Consulting Agreement and recognizing that Cummings is entitled to some award, argue, on a variety of grounds, that the award sought here is too high. (Docket No. 287.)

## **ANALYSIS**

**I.     Legal Standard**

Both parties recognize that Tennessee adheres to the "American Rule," that is, while a successful civil litigant is generally not entitled to attorneys' fees, a party in a civil action may recover attorneys' fees if a contractual or statutory provision creates a right to recover. *House v. Estate of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008). Therefore, where, as here, the relevant contract specifically provides for the recovery of attorneys' fees, the court should determine that such fees are recoverable and should then endeavor to determine the appropriate award. *Id.*

The party seeking an attorneys' fee award pursuant to a statute or contract has two main obligations: (1) to provide the court with "evidence supporting the hours worked and rates claimed" and (2) to demonstrate that the requested fee award is "reasonable." *Building Service Local 47 v. Grandview Raceway*, 46 F.3d 1392, 1402 (6th Cir. 1995); *U.S. Structures v. J.P. Structures*, 130 F.3d 1185, 1193 (6th Cir. 1997). Waller has provided the court with more than 230 pages of task descriptions that document, day-by-day for the entire course of this litigation,

6

the task that each individual at Waller performed and the time spent thereon. Cummings and Waller have clearly provided the court with "evidence supporting the hours worked and rates claimed." The remaining question is whether, in light of all of the circumstances of this case, the fee award sought is "reasonable."

The starting point for determining the reasonableness of a requested fee is the "lodestar" analysis, whereby the requested fee is compared with the amount generated by multiplying the number of hours reasonably worked on the litigation by the reasonable hourly rate. *U.S. Structures*, 130 F.3d at 1193. A reasonable hourly rate is determined by considering the skill, experience, and reputation of the attorneys involved and the market in which they practice. *Adlock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000). If the requested fee is essentially in line with the "lodestar," then there is a strong presumption that the requested fee is reasonable and recoverable. *Id.*

In addition to the lodestar analysis, the court should also consider any relevant "*Johnson*" factors and whether some adjustment to the award is required under those factors. *See Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999)(*citing Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). These factors are: (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the

7

nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* The Sixth Circuit has recognized that, often, these factors are naturally blended into the reasonableness analysis. *Paschal v. Flagstar Bank*, 297 F.3d 431, 435 (6th Cir. 2002).

## II.     The Appropriate Award - Cummings' Position

In support of its position that its hourly rate and hours expended were reasonable, Waller submitted detailed information regarding who worked on the case, the amount each person worked on the case, and each individual's billing rate. According to these submissions, over the three-year litigation, there were six attorneys at Waller who worked on this case, each with a different billing rate. Mr. Boston ($460 for 2009, the only year he worked on the case) and Mr. Harvey (ranging from $330 in 2006 to $400 in 2009) are partners at Waller with about 25 years of litigation experience each. (Docket No. 260 at 14.) Mr. Boston performed 231.3 hours of work, most of which was in conjunction with being "first chair" at trial. (*Id.*) Mr. Harvey, over the three-year period, performed 830.8 hours of work. (*Id.*)

Mr. Edwards (ranging from $215 in 2006 to $270 in 2009) is a junior partner and Ms. Scott-Kinslow (ranging from $215 in 2006 to $255 in 2009) is a senior associate, and both have about a decade of experience. (*Id.*) Edwards performed 719.2 hours of work and Scott-Kinslow performed 1424, which was the most of any of the Waller attorneys. (*Id.*) Heather Hubbard (ranging from $185 in 2006 to $230 in 2009) and Michael Harmon ($160 in 2008 and $180 in 2009) are more junior associates. (*Id.*) Over the three years, Ms. Hubbard performed 163.5 hours of work and Mr. Harmon performed 194.5 hours over the course of 2008 and 2009. (*Id.*) Additionally, four paralegals/litigation support specialists provided, in total, about 600 hours of

8

assistance in this matter, at an hourly rate ranging from $130 to $150 per hour. (*Id.* at 15.)

In total, Waller claims that it worked 4,568.2 hours on this litigation and, in total, charged $1,183,577.30 in fees, which comes out to a $259.09 hourly rate.[3] Waller submitted, attached to Mr. Harvey's declaration, excerpts from the 2008 National Law Journal (NLJ) Billing Survey, which indicates that the median hourly billing rates for a comparable Nashville law firm (Bass Berry & Sims) were $245 for associates and $408 for partners. (Docket No. 265 Ex. 3.)

Given the NLJ information, Mr. Riley's declaration, and the court's own familiarity with the Waller firm, this average hourly rate is reasonable. Indeed, the defendants do not directly dispute the reasonableness of the hourly rates. Therefore, the rates that Waller charged in this case are not an impediment to full recovery of its requested fee.

Waller also claims that a reasonable number of hours were expended. (Docket No. 260 at

---

[3] This amount includes fees incurred for time spent preparing the attorneys' fee petition. This area of the request, however, is highly problematic. For a case brought to trial, these fees are recoverable up to a 5 percent ceiling, but any recovery remains within the court's discretion and must be in "proportion to the main case." *Coulter v. Tennessee*, 805 F.2d 146, 151 (6th Cir. 1986.). Here, Waller asserts that it charged $55,229.50 for preparing the fee application, which, at Waller's $259.09 average hourly rate, equates to about *213 hours* preparing this petition. (Docket No. 260 at 12.) In contrast, Waller billed $80,447.80 for all of October 2008 and November 2008, the two months in which Waller attorneys worked on the summary judgment briefing in this case (among other things). For the attorneys' fee petition to cost about 70 percent as much as the cost of preparing complex cross-motions for summary judgment is strikingly "out of proportion." Additionally, unlike in other areas of the application, Waller makes no effort to more clearly explain where all of this time went, and the court's review of the task descriptions from this time period finds an inordinate number of entries that vaguely say something along the lines of "work on attorneys fees motion" and "continued work on fee application." (Docket No. 262 Ex. 2 Part 6 at 26, 33.) Whatever the rationale for spending such a large amount of time on this one motion, it is clear that the same result could have been accomplished in much less time. The court will, therefore, limit Waller's recovery to $10,000, or about 40 hours of work.

9

16.) In support of this position, Cummings and Waller walk the court through the protracted, three-year history of this litigation, arguing that the substantial award is justified by the considerable and unusual efforts of counsel that this case required. Cummings notes that "the litigation was lengthy and involved three parties, two-forum litigation, document-intensive discovery, out-of-state depositions, and significant discovery questions and disputes as to scope and breadth," along with, of course, thorough summary judgment briefing, a six-day trial, and protracted post-trial briefing. (Docket No. 260 at 2-3.) Cummings and Waller also note that, while there was no way to avoid the considerable costs associated with reviewing and producing more than one hundred thousand pages of documents and preparing for and taking numerous out-of-state depositions, they sought to reduce costs where possible, such as by having Cummings' employees review documents and by repeatedly attempting to settle this case. (*Id*. at 4-8.)

Each step of the way, Cummings claims, the defendants sought unreasonable settlement terms and took steps to increase discovery costs, such as by insisting on scheduling a "do-over," second deposition of BP representative Eric Ulmer in Chicago. (*Id.*) Cummings claims that, even after the favorable summary judgment ruling, it still sought to end this litigation on reasonable terms, offering the defendants a "walk away" settlement shortly before trial. (*Id.* at 8.) According to Cummings, the defendants never suggested that they would settle this litigation for less than $400,000. (*Id.*)

In light of all of this, Cummings and Waller claim that the hours expended, while high, are entirely reasonable. That is, despite numerous cost-saving measures, "[t]his was [still] a

10

large-scale business dispute which required the work of several attorneys working, at times regularly, to set the course, draft pleadings, propound and answer discovery, produce and review documents, manage electronic discovery, take depositions, meet deadlines, prepare for and conduct a lengthy trial, and represent Cummings, all over the course of three years." (Docket No. 260 at 17.)[4]

Waller and Cummings, however, concede that there are two areas that justify a reduction in fees. First, logically, they do not seek to recover attorneys' fees that were generated in conjunction with pursuing Cummings' claims against BP. (Docket No. 247 at 1.) Attached to Mr. Boston's declaration is a spreadsheet of "billing entries related to BP," which lists the timekeeper, date of entry, time spent, and cost incurred on the task. (Docket No. 261 Ex. 1.) Based upon the entries in the spreadsheet, Cummings contends that the fees attributable to BP total just $55,211. (*Id.*) On this basis, the total fee award requested has been reduced by Waller from $1,183,577.30 to $1,128,366.30. (Docket No. 265 Ex. 1.)

Additionally, while somewhat buried in Mr. Boston's declaration, Waller, through its lead counsel, concedes that Waller's work on Cummings' motion for reconsideration of the

---

[4]Waller and Cummings also argue that application of the relevant *Johnson* factors, that is, "the time and labor required by the case," "the amount involved and the results obtained," the "preclusion of employment by the attorney due to acceptance of the case," the "novelty and difficulty of the questions presented," the "skill needed to perform the legal service properly," the "experience, reputation, and ability of the attorneys," the "customary fee," and the "nature and length of the professional relationship with the client" all provide support for the award. (*Id.* at 21-24.) While these brief arguments largely rehash the points previously made, they build upon the core premise, which is that this was a complex, difficult, and time-consuming case by nature and that the opponent did nothing to make it less so, and, therefore, Waller is entitled to the full fee requested. (*Id.*)

11

court's decision reducing the punitive damage award "should not . . . be within any fee award." (Docket No. 261 at 4.)

While Waller's lead counsel makes this concession, no assistance is provided to the court in making the appropriate deduction, and Waller's $1,128,366.30 fee request includes the entire $38,189.50 (for 135.50 hours of work) that Waller billed Cummings in August 2009 – the month in which Waller prepared the reconsideration motion. (Docket No. 265 Ex. 2.) The court has reviewed Waller's task descriptions for August 2009, and it appears that approximately 82.3 hours were dedicated to the preparation of this motion. (*Id.*) With the average billing rate for August 2009 being $281.84 ($38,189.50 divided by 135.50), the court concludes that $23,195 (82.3 multiplied by $281.84 and rounded down to the nearest dollar) is an appropriate further reduction, bringing the requested fee to $1,105,171.30.

## III. The Defendants' Response and Conclusions

As noted above, in response, the defendants do not challenge the reasonableness of the rates charged by Waller, but they assert a variety of reasons why the requested fee is too high. One of the defendants' primary arguments is that Waller billed too many hours, meaning that Waller's requested fee could not be a reasonable "lodestar." Other than this, the defendants assert a series of case-specific justifications for a reduction in the fee award.[5]

---

[5] The defendants also make a series of more minor arguments, none of which has a substantial bearing on the main issue at hand here. For instance, the defendants point out that the attorneys' fee provision in the Consulting Agreement does not provide for the recovery of "expenses," but there is no indication that Waller is seeking expenses (such as legal research fees and travel costs) in addition to hourly fees. (Docket No. 287 at 6.) The defendants, at length, also reiterate the arguments advanced in their unsuccessful motion to strike. (*Id.* at 6-9.)

12

### A. Number of Hours Billed

The defendants claim that Waller attorneys billed time in an "excessive, redundant, and otherwise unnecessary manner" and, therefore, the court should "trim the fat" from Waller's submission. (Docket No. 287 at 24-25.) The defendants argue that the "windfall" nature of Waller's requested fee award can be gathered from the fact that it would come very close to exceeding the total judgment (including punitive damages) that Cummings ended up receiving in this case. (*Id.* at 26.) The defendants contend that the fees became excessive because Waller staffed too many lawyers on the case and that they all billed too many hours. (*Id.* at 28-30.) In contrast, the defendants claim that they only billed 2,878.9 hours on this matter and only generated $558,447.50 in fees.[6] (*Id.* at 30.)

The defendants also claim that the task descriptions do not appropriately indicate the task performed, employ "block billing," that is, they "lump" multiple tasks into a single description,

---

Without support or citation, the defendants also argue that, because Cummings' litigation costs were discussed by witnesses during the punitive damage portion of the trial, Cummings already received compensation for its attorneys' fees in the punitive damage award. (*Id.* at 15-17.) This argument is plainly without merit, and, as the court has already reduced the punitive damage award by more than $2 million dollars, any suggestion that an attorneys' fee award would still constitute "double dipping" is misplaced. The defendants also argue that Cummings may not recover fees against Donald Devorris, because the attorneys' fee provision in the Consulting Agreement only permits the recovery of fees if the party is successful on a claim initiated by that party, which would not apply to the claims that Cummings asserted against Devorris individually (initiated but not successful) or the claims that were brought by Devorris that Cummings defended against (successful but not initiated). (*Id.* at 18.) A basic review of the fee-shifting provision reveals that the provision is not nearly this intricate. The provision permits recovery for "either party" when it "prevails" in "enforcing its rights" under the Consulting Agreement. Therefore, the defendants' argument on this point is also without merit.

[6]Of course, as Cummings is happy to point out, the defendants also lost. (Docket No. 291 at 15.)

13

and that they are also frequently redacted. (*Id.* at 26-28.) These defects, the defendants claim, preclude a fair analysis of the work Waller performed and necessitate that some across-the-board reduction in the fee award be made. (*Id.*)

These arguments are not convincing. As to the supposed defects in the task descriptions, the court has reviewed all of the descriptions and, in the vast majority of cases, was able to clearly ascertain what tasks were performed. Any redactions were relatively minor and were clearly done to protect attorney-client privilege. Additionally, while there is no question that Waller attorneys spent a substantial amount of time on this case, from the court's review of the task descriptions, there is no indication that Waller attorneys "padded" their hours or billed needlessly or excessively.

Rather, as Cummings argues, the fees are high because this was a more than three-year litigation that "had it all," including burdensome and time-consuming discovery issues, complex procedural issues, motion practice, two mediation sessions, a lengthy trial and considerable post-trial briefing. The defendants continued to pursue their claims in this litigation and shied away from settlement, knowing that the Consulting Agreement contained a fee-shifting provision and also knowing that Cummings was represented by a large law firm with substantial billing rates and a practice of "staffing" big litigation and that, at the end of the litigation, Waller would have a large bill. The defendants have shown no viable basis for an across-the-board reduction here.

### B. Recovery for the IIBR Claim

As discussed above, the defendants claim that other, case-specific, issues justify a reduction in the fee award. First, the defendants argue that "Cummings is not entitled to an

14

award for attorneys' fees for the IIBR claim . . . as there is no fee shifting provision provided under this tort action." (Docket No. 287 at 10.) That is, work performed on the breach of Consulting Agreement claim is potentially recoverable because of the fee-shifting provision in the Consulting Agreement, but the court should not permit recovery for work performed on the IIBR claim because that claim was "wholly unrelated" to the breach of Consulting Agreement claim, as it involved a different legal theory and a different set of facts. (*Id.*)

By way of a brief review, the premise of the IIBR claim (by the time this case was tried to a jury) was that, in the 2005-2006 time period, Blair Sign used improper means to steal the "bull nose" sign work that Cummings did for BP. (*Id.* at 10-11.) The premise of the breach of Consulting Agreement claim (by the time that this case was tried to a jury) was that, in 2003-2004, Blair Sign, in violation of the Consulting Agreement, contacted BP (a "prohibited customer" under the Consulting Agreement) about performing additional MID sign work for Blair Sign. (*Id.*) Therefore, the defendants claim, the claims are readily distinguishable. Additionally, the defendants argue that, because the IIBR claim was "much more complicated and intricate," with five, contested elements, "there should be a significant reduction of the entire [amount] requested by Cummings on the basis that the vast majority of this case involved litigating a tort claim that was separate and distinct from the only claim giving rise to a potential award for attorneys' fees." (*Id.* at 12-13.)

There are several problems with this argument. First, as to disputes between the parties under the Consulting Agreement, the fee-shifting provision calls for the losing party in "*any action*" to pay "*all* of such prevailing party's reasonable attorneys' fees incurred *in connection*

15

*with* such action, suit or proceeding." (Docket No. 260 Ex. 1 at 5.)(emphasis added). Therefore, the natural reading of the broad language in the agreement provides no support for the defendants' position that claims should be parsed, and, indeed, it appears to dictate that attorneys' fees are recoverable in litigation between the parties that is associated with, but not necessarily directly connected to, a breach of Consulting Agreement claim.

Moreover, the Sixth Circuit has stated that, "when claims are based on a common core of facts or are based on related legal theories, for the purpose of calculating attorney fees they should not be treated as distinct claims, and the cost of litigating the related claims should not be reduced." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1169 (6th Cir. 1996). Here, while there is some distinction between the operative facts used to prove each claim, there is no question that the claims arose from a "common core of facts" and are "based on related theories." Indeed, Cummings' overall theory was that the defendants had taken advantage of the relationship created by the Consulting Agreement in a variety of ways, some of which supported the breach claim and some of which supported the IIBR claim. (See Docket No. 154 at 22.)

Furthermore, the court has reviewed the more than 230 pages of task descriptions in this case and they entirely bear out Cummings' claim that the work done by Waller in this case was "not specific to any cause of action." (Docket No. 291 at 11.) That is, Cummings focused on refuting the facts behind Devorris's breach of Consulting Agreement claim and on uncovering evidence that the defendants acted improperly in light of their relationship under the Consulting Agreement. (Docket No. 265 Ex. 2.) Therefore, there is no support for the proposition that the court could, or should, reduce Cummings' award based upon a supposedly independent pursuit

16

of the IIBR claim.

### C. Cummings' Success

Next, the defendants argue that the "results obtained" *Johnson* factor suggests that the award should be reduced in this case. (Docket No. 287 at 13.) That is, because Cummings, at the summary judgment stage, lost on four of its six claims against Blair Sign, the court should view Cummings as only having obtained "limited success," and, therefore, the fee award should be reduced. (*Id.* at 14 citing *Isabel v. City of Memphis*, 404 F.3d 404, 416 (6th Cir. 2005)).

Consistent with the approach discussed above, the Sixth Circuit has rejected this type of "scoreboard" success analysis, that is, "a court should not reduce attorney fees based on a simple ratio of successful claims to claims raised." *Thurman*, 90 F.3d at 1169. Indeed, under *Johnson* and the cases interpreting it, the relevant issue is not claims "won" versus claims "lost," but the "result achieved." *Adcock*, 227 F.3d at 349. Where an excellent result is achieved, the lodestar fee should not be adjusted downward because the prevailing party lost on some claims. *Id.* Here, by any objective measure, Cummings obtained an "excellent" result, and, therefore, the defendants' argument on this point provides no support for a reduction of the fee.

### D. BP as Co-Defendant

The defendants also argue that Waller's conceded $55,211 reduction for fees incurred in pursuing this litigation against BP is too low. (Docket No. 287 at 21.) The defendants claim that BP was essentially on equal footing with Blair Sign/Devorris for more than a year of this litigation, yet Waller attributes much less than 50 percent of the work it performed during that

17

time to BP. (*Id.* at 22.) The defendants point out that, on Waller's submission, Cummings incurred $394,569 in fees during the period from July 2006 (when the litigation began) to July 31, 2007 (roughly when settlement was reached) and, the defendants suggest, at least half of this amount should be considered attributable to BP. (*Id.* at 23-24.)

Cummings contends that the fee should not be reduced beyond the $55,211 because its "attorneys would have undertaken the same litigation strategy had Cummings not sued BP." (Docket No. 291 at 8.) That is, because the defendants' interactions with BP were a key issue in the case against Blair Sign, Cummings would have undertaken similar discovery efforts and would have taken similar depositions, even if BP had not been sued. (*Id.* at 9.)

As discussed above, Waller produced a spreadsheet that listed the task descriptions that it attributed to BP work and for which it was not seeking fees. The court, however, went through the more than 230 pages of task descriptions and discovered dozens of additional task descriptions (not addressed in the spreadsheet) in which tasks related to prosecuting the case against BP are discussed, usually concerning either discovery issues, communications with BP counsel, or the mediation. While it was somewhat difficult to discern the basis upon which Cummings distinguished task descriptions for inclusion on the spreadsheet, it appears that, by and large, Cummings only included those descriptions that mentioned a specific discussion with BP counsel about a specific matter.[7]

---

[7] The court recognizes that, for some of the task descriptions that are included on the spreadsheet, additional work that was not directly connected to BP is included in the description and, therefore, on those entries, Waller might be conceding some time for work that was not BP-related.

18

While this is not an exact science, it is clear from the court's review of the task descriptions that there should be a significant additional reduction in fees for the work Cummings did (through counsel) prosecuting this case against BP. The task descriptions are littered with descriptions of unaccounted for, BP-specific work that was only performed because BP was a litigant, such as preparing for initial disclosures to BP, responding to discovery propounded by BP and addressing discovery disputes with BP.[8] There are also a plethora of other descriptions (not accounted for on the spreadsheet) that generally refer to work prosecuting the case against "the defendants."

While the court recognizes that, perhaps, some of these fees would have been incurred had third-party discovery been sought from BP, it is hard to believe that anywhere near the same number of hours would have been billed, and, moreover, BP was not a third-party litigant in this case. The record makes clear that Cummings sued BP and, for more than a year, litigated a case against BP as well as against Blair Sign/Devorris. The court can only use its discretion and attempt to reasonably approximate the amount attributable to BP, but, after reviewing the task descriptions, the court concludes that, for the period that BP was in this case, it essentially stood on equal footing with Blair Sign/Devorris. Therefore, the defendants' requested 50 percent allocation is reasonable.

---

[8] While this point cannot be easily captured, it is worth providing an example. On March 16, 2007, Scott-Kinslow billed 4.2 hours for "[p]reparing responses to interrogatories propounded upon Cummings by BP." (Docket No. 265 Ex. 2 Part 2 at 14.) Over the next several days, several of Scott-Kinslow's task descriptions (all unaccounted for on Waller's spreadsheet) refer to preparing responses to this discovery, including an 8.3 hour entry on March 20, 2007. (*Id.* at 14-15.)

19

On this basis, the court will further reduce the requested award by $151,426 to $953,745.30. That is, from July 2006 to August 2007 (the last full month that BP was in this case) Waller's records demonstrate that Cummings incurred $413,275 in fees, 50 percent of which is $206,637 (rounding down to the nearest dollar). Reducing that total by the $55,211 already conceded, results in an amount of $151,426. The further $45,229.50 deduction related to the volume of work performed on the attorneys' fee petition brings the final total to $908,515.80.

## CONCLUSION

The parties do not dispute that Cummings is entitled to attorneys' fees. After reviewing the record and the arguments advanced in briefing, the court determines that Cummings' requested fee award of $1,128,366.30 is reasonable except that (1) it does not appropriately account for work performed in prosecuting the case against BP, (2) it does not account for the time spent on a motion that Waller's lead counsel conceded should not be within any fee award, and (3) the fees associated with preparing the attorneys' fee petition are too high. As discussed above, accounting for these deductions, the appropriate award is $908,515.80, and the court will enter a judgment for the same.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge